IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TAMMY DINGER, ) <br> ) <br>     Plaintiff/Counter-Defendant, ) <br> ) <br> v. ) <br> ) <br> CANDACE WISHKENO, ) <br> ) <br>     Defendant, ) <br> ) <br> v. ) <br> ) <br> ST. PAUL FIRE AND MARINE ) <br> INSURANCE CO., ) <br> ) <br>     Garnishee/Counter-Plaintiff. ) | No. 18-cv-08390 <br><br> Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

In 2009, Candace Wishkeno killed Darren Dinger in a highway motorcycle crash in Riley County, Kansas. Darren Dinger's widow, Tammy Dinger ("Dinger"), won a civil judgment against Wishkeno and subsequently filed a garnishment summons in the Circuit Court of Cook County, Illinois against St. Paul Fire and Marine Insurance Co. ("St. Paul"). St. Paul removed the matter to this Court based on diversity of citizenship. At issue is whether Wishkeno's judgment was covered by an insurance policy issued by St. Paul and held by the Kickapoo Tribe in Kansas. The parties have now filed cross-motions for summary judgment. (Dkt. Nos. 57, 73.) Because Wishkeno was not covered by the insurance policy at the time of the accident, the Court grants St. Paul's motion for summary judgment and denies Dinger's motion for summary judgment.

## BACKGROUND

Dinger initiated this case with a summons for garnishment in the Circuit Court of Cook County, seeking payment from St. Paul to satisfy a $1.66 million judgment she holds against

Wishkeno. (Notice of Removal, Ex. A, Garnishment Notice, Dkt. No. 1-1). St. Paul removed the case to this Court.[1] St. Paul filed a counterclaim seeking a declaratory judgment that St. Paul has no obligation to make any payment because Wishkeno was not insured under its policy. (Countercl. of Garnishee, Dkt No. 22.) In turn, Dinger filed her own counterclaims for breach of contract and negligent bad faith failure to defend, which she later amended. (Pl.'s Am. Answer & Am. Countercl., Dkt. No. 52.) The parties have moved for summary judgment. (Dkt. Nos. 57, 73.)

The relevant facts are undisputed. On July 23, 2009, Wishkeno drove her car into the path of Darren Dinger, who was riding a motorcycle and was killed in the resulting accident. (Garnishee's Resp. to Pl.'s Statement of Facts ("GRPSF") ¶ 6, Dkt. No. 89; Pl.'s Resp. to Garnishee's Statement of Facts ("PRGSF") ¶ 7, Dkt. No. 71.) At the time of the accident, Wishkeno was driving her personal vehicle (which she and her mother owned) in the course of her employment with the Kickapoo Tribe, transporting tribal youth. (GRPSF ¶¶ 8, 10; PRGSF ¶ 8.) Wishkeno's use of her own vehicle was consistent with the Kickapoo Tribe's policies—she had the Tribe's permission to do so and was reimbursed by the Tribe for mileage and related expenses. (GRPSF ¶¶ 22–23, 25–26.) Wishkeno had planned to use a vehicle leased by the Tribe but used her own car because the leased vehicle was unavailable. (*Id.* ¶¶ 27–28.)

As Administratrix of her husband's estate, Dinger sued Wishkeno and the Kickapoo Tribe in Kansas state court. (GRPSF ¶¶ 11, 15.) The Kansas court granted summary judgment in favor of the Kickapoo Tribe on the basis of sovereign immunity. (PRGSF ¶ 13.) Wishkeno, who was defended by her personal insurer, paid Dinger $100,000 in partial satisfaction of Dinger's claims.

---

[1] Because St. Paul was not named as a party in the underlying action in which the $1.66 million judgment was ordered, the garnishment summons presented the first opportunity for Dinger and St. Paul to contest the question of insurance coverage. Thus, this case was properly removed as a civil action pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity of citizenship between the parties and the amount in dispute exceeds $75,000. *See Travelers Prop. Cas. v. Good*, 689 F.3d 714, 725 (7th Cir. 2012) ("[W]hen garnishment proceedings present genuine disputes with new parties and raise new issues of fact and law, courts overwhelmingly treat them as independent and removable actions.").

2

(*Id.* ¶ 15.) Under the settlement, Dinger agreed not to execute against Wishkeno's assets and to hold Wishkeno harmless as to any judgment entered in the underlying case. (*Id.*) On July 8, 2014, Dinger was awarded a judgment for $1,662,628.39 against Wishkeno following a trial where Wishkeno was represented by counsel. (GRPSF ¶ 15.) On February 11, 2016, Dinger and Wishkeno signed an addendum to their settlement agreement stating that Wishkeno assigned to Dinger "any and all of her claims . . . that may provide coverage to her for the incident occurring on July 23, 2009 [the accident]." (*Id.* ¶ 19.)

The Kickapoo Tribe held an insurance policy ("Policy") issued by St. Paul that provided "Auto Liability Protection" of up to $1,000,000 per accident and "Umbrella Excess Liability Protection" in the same amount. (PRGSF ¶¶ 18, 20). In a dispute with Wishkeno's personal insurer, Safeco Insurance Company (which defended Wishkeno in the underlying litigation), St. Paul denied coverage to Wishkeno based on a Federal Tort Claims Act ("FTCA") exemption to the Policy. (GRPSF ¶¶ 35, 38.) Thomas Wright, a St. Paul representative, wrote:

> Ms. Wishkeno would normally be provided excess or umbrella coverage under the Kickapoo Tribe's insurance policy and would be considered a 'protected person' under the policy, but for the fact this matter involves a 638 Contract with the Federal Government and this requires that any claim be brought under the Federal Tort Claim [sic] Act protections.

(*Id.* ¶ 39.) Ultimately, however, it was revealed that Wishkeno was not working under a contract that required her to seek relief under the FTCA. On February 18, 2011, an attorney for the Kickapoo Tribe informed St. Paul that the FTCA did not apply to the accident because Wishkeno was working under a government grant, not a contract. (*Id.* ¶ 43.) The record does not indicate that St. Paul ever communicated directly to Wishkeno or Dinger any other basis for denying coverage. In April 2011, corresponding with Dinger's counsel, St. Paul acknowledged that, "It is understood that in the event that Ms. Wishkeno is determined to not be entitled to protection under the Federal

3

Tort Claim [sic] Act, the Dinger family will, of course, look to Travelers [St. Paul] to satisfy their claim that is in excess of the Safeco policy limits." (*Id.* ¶ 42.) Dinger pursued an FTCA claim, which was ultimately denied. (*Id.* ¶ 46.) On November 4, 2011, counsel for the Kickapoo Tribe informed Dinger's counsel that St. Paul had determined that Wishkeno was not a "protected person" under the Policy—a new basis for denial of coverage, distinct from the FTCA exclusion. (PRGSF ¶ 14.)

## DISCUSSION

Under Federal Rule of Civil Procedure 56, "[a] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a summary judgment motion, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The moving party is entitled to a judgment as a matter of law [where] the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Illinois's choice of law rules govern this matter. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law.") In Illinois, unless an insurance policy makes an express choice of law, the applicable law is determined by the locations pertinent to the policy, such as the policy's subject matter, place of contract delivery, domicile of insured or insurer, and other related locations. *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995) (quoting *Hofeld v. Nationwide Life Ins. Co.*, 322 N.E.2d 454, 458 (Ill. 1975)). As the Policy was issued in

4

Kansas to a Kansas Indian tribe, Kansas law applies to the interpretation of the Policy. (Garnishee's Mot. at 5–6, Dkt. No. 58; Pl.'s Mot. at 12–13, Dkt. No. 74.)

### I.     Validity of Wishkeno's Assignment to Dinger

St. Paul has raised as a threshold issue whether Dinger holds any right to enforce Wishkeno's coverage claims against St. Paul. When Dinger and Wishkeno entered into their settlement agreement in 2012, Dinger agreed to hold Wishkeno harmless and not to pursue any of the latter's assets in satisfying any related judgment. St. Paul contends that the settlement, by terminating Wishkeno's personal liability, extinguished any assignable interest in the Policy. As further evidence of the assignment's purported invalidity, St. Paul also notes that four years elapsed between the 2012 settlement and the 2016 addendum, which explicitly assigned Wishkeno's claims to Dinger.

In the June 2012 settlement, Wishkeno and Dinger state their intention to exempt Wishkeno from personal financial responsibility, except "to the extent that there is an insurance policy providing coverage to [Wishkeno] in excess of the Settlement Amount." (Notice of Removal, Ex. C, Settlement Agreement & Covenant not to Execute ¶ 4, Dkt No. 1-1.) The agreement further states, "Nothing in this Agreement is intended to or shall preclude or prevent [Dinger] from enforcing judgment against the proceeds of any insurance policy that provided coverage to Settling Defendant in excess of the Settlement Amount on the date of the Accident." (*Id.*) The 2012 settlement therefore contemplates that Dinger may enforce coverage against other insurers. In February 2016, Dinger and Wishkeno entered a "Settlement Addendum" which, for "purposes of clarification," assigned all of Wishkeno's claims against St. Paul to Dinger and gave Dinger the right to prosecute, settle, assign and otherwise control those claims. (Pl.'s Am. Answer & Am. Countercl., Ex. 8, Addendum to Settlement Agreement at 2, Dkt. No. 52-8.)

St. Paul's position that the settlement extinguished any assignable interest in the Policy is contrary to Kansas law. As explained by the Kansas Supreme Court in *Glenn v. Fleming*, 799 P.2d 79 (Kan. 1990), "[a] nonjury verdict judgment may be enforced against an insurer contingent upon proving bad faith or negligence in a refusal to settle. The assignment/covenant not to sue may be utilized if the judgment is reasonable in amount and entered into in good faith." *Id.* at 93. Further, "an insured's breach of contract claim for bad faith or negligent refusal to settle may be assigned." *Id.* at 91. Thus, Kansas law allows for assignments of claims and covenants not to sue, with the enforceability of a resulting judgment dependent on its reasonableness.

Here, the judgment Dinger seeks to enforce was imposed as the result of an independent determination of reasonable damages by the Kansas state trial court. (Pl.'s Am. Answer & Am. Countercl., Ex. 9, Memorandum of Decision at 5, Dkt. No. 52-9.) St. Paul does not attack the reasonableness of the judgment or the good faith of the parties in reaching the judgment, but instead argues that the assignment of claims combined with a covenant not to sue is invalid on its face. Yet St. Paul has not cited any authority interpreting Kansas law in support of its position. To the extent St. Paul argues that the delay between the settlement and addendum (4 years) or between the judgment and addendum (2 years) invalidates the assignment of claims, St. Paul again fails to cite any authority establishing a time limit for a party to validly assign claims. As the Kansas Supreme Court has noted, collateral adverse effects remain for defendants who agree to a covenant not to execute, even when their personal assets cannot be collected against; for this reason, signing a covenant not to execute does not extinguish a claim against an insurance provider. *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 84 (1997). And while St. Paul argues that Dinger's cited authority is distinguishable because none of the cases involve an assignment of claims executed years after the settlement, St. Paul offers no reason why

6

that delay makes a material difference. Instead, St. Paul's primary argument is that the covenant not to execute eliminated Wishkeno's interest in further coverage from St. Paul—a position that Kansas courts have rejected. Because Kansas law allows for assignments of claims against insurers and covenants not to sue, and St. Paul has presented no argument that the resulting judgment amount was not "reasonable" or reached in good faith, this Court concludes that Wishkeno appropriately assigned her claims to Dinger.

## II. Wishkeno as a "Protected Person" under the Policy

The Court next turns to the crux of the parties' dispute: whether Wishkeno was covered as a "protected person" under the Policy. Dinger contends that the Policy is ambiguous on this point and so must be construed in favor of coverage. But her position ignores the fact that the Policy provides coverage only for "protected persons" while unambiguously stating that employees driving their own vehicles are not protected persons.

The elements of Dinger's breach of contract claim (Count One) require her to prove, among other things, that (1) St. Paul breached its contract, here by wrongfully denying coverage or failing to defend Wishkeno, and (2) Dinger (or Wishkeno via assignment of claims) was damaged by that breach. *See Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (listing elements of breach of contract claim). The same standard applies to Dinger's Count Two for "negligent bad faith failure to defend," because Kansas law evaluates that claim under the breach of contract framework. Although Kansas law requires insurers to act in "good faith" and "without negligence," these standards are merely "statements of the contractual obligation an insurer undertakes under a duty to defend. They do not create a new cause of action . . . [but] merely seek to broaden the conduct which constitutes breach of contract." *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 652 P.2d 665, 668–69 (Kan. 1982); *see also Glenn v. Fleming*, 799

7

P.2d at 90 ("bad faith and negligent defense actions are contract actions, not tort actions.") Because Dinger's claims all rest on breach of contract, St. Paul will prevail if it can show that the undisputed material facts prevent Dinger from proving an element of breach of contract. In deciding that issue, the Court takes under consideration the additional injuries that Dinger pleads in Count Two, including that St. Paul wrongfully failed to settle the case and that Dinger was subjected to unnecessary, protracted litigation because St. Paul incorrectly asserted that her remedies lay under the FTCA.

In coverage disputes, it is generally the insured's burden to establish coverage. *Kansas Farm Bureau Ins. Co. v. Reynolds*, 823 P.2d 216, 218 (Kan. Ct. App. 1991) ("It is the general rule that the insured has the burden of proving the loss sustained was one that comes within the coverage of the policy."). But when an insurer claims an exception under an insurance policy, the burden shifts to the insurer to show that the exception applies by "prov[ing] the facts which bring the case within such specified exception." *Baugher v. Hartford Fire Ins. Co.*, 522 P.2d 401, 409 (Kan. 1974) (citing *Sears v. Insurance Co.*, 196 P. 235 (Kan. 1921)). Furthermore, "the test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean." *Farm Bureau Mut. Ins. Co. v. Winters*, 806 P.2d 993, 996 (Kan. 1991) (citing *All. Life Ins. Co. v. Ulysses Volunteer Fireman's Relief Assn.*, 529 P.2d 171 (Kan. 1974). Whether a contract is ambiguous is a question of law for a court's determination. *Weber v. Tillman*, 913 P.2d 84, 96 (Kan. 1996). "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Id.*

The relevant coverage provisions of the Policy are not ambiguous or subject to doubtful or conflicting meaning. The Policy's auto liability protection section states: "We'll pay amounts **any**

*protected person* is legally required to pay . . . [that] results from the ownership, maintenance, use, loading or unloading of a covered auto; and is caused by an accident . . . ." (Countercl. of Garnishee, Ex. A, St. Paul Policy at 31, Dkt. No. 22-1 (emphasis added).) The Policy defines several categories of "protected persons." Dinger claims that Wishkeno was covered under the following category:

> **Any permitted user.** Any person you've given permission to use a covered auto you own, rent, lease, hire or borrow is a protected person. However, we won't consider the following to be a protected person: . . . An employee of yours or a member of an employee's household if the covered auto is owned by that employee or member of that employee's household.

(*Id*. at 35.) By the Policy's express terms, a "permitted user" only includes persons using a "covered auto" that the Kickapoo Tribe owns, rents, leases, hires, or borrows. Thus, an employee of the Kickapoo Tribe is not a protected person under this clause when driving a "covered auto" that the employee owns.

The Policy also states that its "covered auto" provisions extend to "any auto" (*Id.* at 9, 34.) The Policy provides the following definition: "[a]ny auto means any owned, rented, leased or borrowed auto. It includes hired, nonowned, newly acquired, replacement and temporary substitute autos." (*Id.* at 34.) The Policy goes on to explain that "[n]onowned autos means any auto that: you don't own, hire, rent, lease or borrow; and is used in the conduct of your business. It includes autos owned by your employees or partners or members of their households. But only while such autos are being used in the conduct of your business." (*Id.*)

Reading those provisions together, Wishkeno clearly was not a protected person under the Policy. First, and most importantly, "any permitted user" explicitly does not include Kickapoo Tribe employees driving vehicles they own. The parties agree that Wishkeno owned the vehicle she was driving at the time of the accident. This alone excludes her from the scope of the coverage

9

clause. Second, "any permitted user" defines protected persons to include only "[a]ny person you've given permission to use *a covered auto you own, rent, lease, hire or borrow*." (*Id.* at 35 (emphasis added).) Critically, the Policy does not protect any person with permission to use any covered auto; it only protects covered autos that the Kickapoo Tribe *owns, rents, leases, hires, or borrows*. This does not include nonowned autos, because "Nonowned auto" is defined by the Policy to exclude vehicles that the Kickapoo Tribe owns, hires, rents, leases, or borrows. (*Id.* at 34.) Further, the "nonowned auto" category "includes autos owned by your employees or partners or members of their households. But only while such autos are being used in the conduct of your business." (*Id.* at 34.) In sum, because Wishkeno was driving a "nonowned auto" at the time of the accident, she was not a permitted user and therefore was not covered under the Policy.

Dinger fails in her attempt to establish ambiguity in the Policy language by manufacturing a conflict between the definitions of "covered auto" and "protected person." Dinger acknowledges that Wishkeno's vehicle was a covered auto under the "nonowned auto" definition but nonetheless contends that Wishkeno was a permitted user of her vehicle because the Kickapoo Tribe gave her permission to use it. But Dinger is incorrect in contending that Wishkeno was a "permitted user" under the Policy because she had the Kickapoo Tribe's permission to use her own vehicle for work. The Policy's terms establish that persons driving nonowned autos are not permitted users— meaning that Wishkeno actually was not a permitted user under the Policy. Further, the "permitted user" clause does not include employees who drive their own cars for work, while the "nonowned auto" category includes cars owned by employees and driven for work. Read together, these Policy provisions show a clear intention not to provide coverage to employees of the Kickapoo Tribe driving their own cars.

10

Dinger asserts that this reading of the Policy produces an absurd result: if Wishkeno had borrowed another employee's car on the day of the accident with permission from the Kickapoo Tribe, she would have been covered by the Policy. Apparently, Wishkeno takes issue with the fact that in both situations Wishkeno would be driving a car owned by a tribal employee with the Kickapoo Tribe's permission, but Wishkeno would only be covered when the car belonged to someone else. But it is far from clear that Wishkeno would have been covered if she had been driving another employee's car—the "permitted users" clause only covers vehicles that the Kickapoo Tribe owns, rents, leases, hires or borrows. And even accepting Dinger's interpretation, there is no plain absurdity. Employees who drive their own cars for work might significantly outnumber employees who borrow one another's cars. Thus, an insurance company might have good reason not to provide coverage to employees who drive their own cars under an insurance policy, regardless of how car-borrowing employees are treated.

The Court's conclusion here is consistent with the out-of-state cases cited by St. Paul, which analyze identical or nearly identical insurance policy provisions and find them unambiguous. *See, e.g., Cont'l Cas. Co. v. Kemper Ins. Co.*, 920 A.2d 66, 71 (Md. Ct. Spec. App. 2007) (finding no ambiguity in substantially identical contract language); *Zurich–American Ins. Grp. v. Wynkoop*, 746 N.E.2d 985, 989–90 (Ind. Ct. App. 2001) (same); *Vargas v. Athena Assur. Co.*, 115 Cal. Rptr. 2d 426, 430 (Cal. Ct. App. 2001) (holding as to substantially identical policy provisions: "the policy does not cover a 'permitted user' for use of a 'nonowned auto' [the employer] does not 'own, hire, rent, lease or borrow'; nor does it cover as a permitted user an employee who owns the auto used.") In contrast, the cases cited by Dinger address significantly different contract terms or fail to justify a finding of ambiguity persuasively. *See Gilmore v. St. Paul Fire & Marine Ins.*, 708 So. 2d 679, 682 (Fla. Dist. Ct. App. 1998) (finding conflict between

11

Case: 1:18-cv-08390 Document #: 108 Filed: 11/30/20 Page 12 of 17 PageID #:1785

"covered auto" provision and "protected person" provision, but not analyzing the requirements under which auto liability coverage is triggered); *Pa. Nat. Mut. Cas. Ins. Co. v. Traveler's Ins. Co.*, 592 A.2d 51, 54 (Pa. Super. Ct. 1991) (holding that policy with substantially different terms from those in the present case was ambiguous because the non-owner provision at issue "afford[s] coverage to a very restricted group of persons").

Dinger also asserts that the determination by Thomas Wright (the St. Paul representative) that Wishkeno was a covered person shows that the Policy was ambiguous. According to Dinger, if even a St. Paul employee in the Complex Claim Unit cannot read the Policy correctly, how could it be unambiguous? But the proper interpretation of the Policy is, of course, a question of law for this Court to determine; and in any case, many factors could account for any one person misreading an insurance policy or otherwise failing to spot a coverage issue, or perhaps even following a practice of erring on the side of coverage when the claim is made even if coverage is likely to be disputed later.

As there is unambiguously no coverage under the Policy, there can be no breach of contract and no duty to defend or settle, dooming Dinger's claims. The duty to defend is broader than the duty to indemnify, and arises even when there is only a possibility of coverage. *See Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 744 (Kan. 1987) ("The possibility of coverage may be remote, but if it exists the company owes the insured a defense.") Still, where there is no coverage under an insurance policy, there is no duty to defend. *Brockmann v. Bd. of Cty. Comm'rs of Cty. of Shawnee*, No. 07-4103-EFM, 2009 WL 175069, at *7 (D. Kan. Jan. 12, 2009) (citing *Ramsey v. Lee Builders, Inc.*, 95 P.3d 1033, 1038 (Kan. Ct. App. 2004)), *aff'd*, 404 F. App'x 271 (10th Cir. 2010). And here, there was no possibility of coverage. Wishkeno was unambiguously not covered by the Policy at the time of the accident. Accordingly, St. Paul had no duty to defend,

12

let alone to indemnify, and Dinger does not argue that a duty to settle can arise where there is no duty to indemnify or defend. In short, Dinger cannot prevail on her claims given the uncontested facts of the case: specifically, that Wishkeno was driving a vehicle she owned at the time of the accident.

Finally, the parties dispute whether the Policy's clauses stating that employees are not covered when driving their own vehicles is a question of coverage in the first instance (Dinger's burden to prove) or a question of whether a coverage exception applies (St. Paul's burden). Here, it makes no difference, because St. Paul has proven on the undisputed material facts that Dinger was an employee driving her own vehicle. Even if St. Paul holds the burden, it easily meets it.

### III. Waiver and Estoppel

Having established that Wishkeno was not a "protected person" covered by the Policy, the Court next considers whether St. Paul nonetheless waived its right to decline coverage or was estopped from declining coverage because of its apparent admission that Wishkeno would have been a "protected person" but for the applicability of the FTCA.

A party asserting estoppel must establish, "that another party . . . induced the party asserting estoppel to believe certain facts existed . . . [and] that the party reasonably relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts." *Owen Lumber Co. v. Chartrand*, 157 P.3d 1109, 1120 (Kan. 2007). "Waiver in contract law implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right." *United Am. State Bank & Tr. Co. v. Wild W. Chrysler Plymouth, Inc.*, 561 P.2d 792, 795 (Kan. 1977).

It is undisputed that St. Paul representative Thomas Wright, in a letter to Wishkeno's personal insurer Safeco, communicated that St. Paul would not provide coverage for the loss. (Pl.'s Am. Answer & Am. Countercl., Ex. 3, Wright Letter to Tom Doofe, Dkt. No. 52-3.) In this letter, Wright wrote that Wishkeno "would be considered a 'protected person' under the policy, but for the fact this matter involves a 638 Contract with the Federal Government." (*Id.* at 2.) Wright mistakenly indicated that Dinger should pursue payment from the federal government under the FTCA. (*Id.* at 2–6.) In correspondence with Dinger's counsel, Wright acknowledged: "It is understood that in the event that Ms. Wishkeno is determined to not be entitled to protection under the Federal Tort Claim Act, the Dinger family will, of course, look to Travelers [St. Paul] to satisfy their claim that is in excess of the Safeco policy limits." (Pl.'s Am. Answer & Am. Countercl., Ex. 5, Wright Letter to Rodney Olsen, Dkt. No. 52-5.) However, Wright did not commit that St. Paul would provide such coverage. Dinger sought relief under the FTCA through an administrative tort claim with the Department of Health and Human Services and subsequently through an action in the U.S. District Court for the District of Kansas, which was dismissed for lack of jurisdiction. (GRPSF ¶¶ 45, 48–49.) Dinger made a policy limits demand on St. Paul, and the record does not indicate that St. Paul responded directly to that demand. (*Id.* ¶ 41.)

Put simply, the gist of Dinger's argument for waiver and estoppel is that St. Paul allowed her to believe that Wishkeno was covered by the Policy but for the FTCA exception, and that Dinger was prejudiced by her reliance on this representation. Certainly, Dinger proceeded on this premise. For purposes of summary judgment, the Court assumes that St. Paul made this representation to Dinger and Dinger reasonably believed it to be true. The problem with Dinger's argument is that under Kansas law, waiver and estoppel will not extend the scope of coverage. *Russell v. Farmers Ins. Co.*, 163 P.3d 1266, 1268 (Kan. Ct. App. 2007) ("[A]n insured's failure to

14

comply with a policy condition may be waived, but generally waiver and estoppel will not expand a policy's coverage."); *see also Topeka Tent & Awning Co. v. Glen Falls Ins. Co.*, 774 P.2d 984, 986 (Kan. Ct. App. 1989) (stating that waiver and estoppel cannot expand the coverage of an insurance policy). Dinger claims coverage under the Policy for a judgment of $1.66 million, but cannot obtain such coverage via waiver and estoppel under Kansas law.

Dinger also has not identified a disputed or undisputed material fact that could show that her reliance on St. Paul's representations has prejudiced her. St. Paul, in its letter to Safeco, did not admit facts that would provide for coverage under the Policy, but instead stated the incorrect conclusion that Wishkeno would have been covered under the Policy but for the FTCA exception. This is not an admission of fact but a conclusion of law, which is not within St. Paul's power to concede. *See State v. Schooler*, 419 P.3d 1164, 1176 (Kan. 2018) ("It is only agreements and admissions of fact which are within the authority of the parties litigant or their attorneys. A court may not be bound by agreements and admissions of the parties as to matters of law or legal conclusions.") (citations omitted). Wishkeno was defended in the underlying action by Safeco, so she did not lack a defense. Wishkeno was not covered by the Policy, so St. Paul did not owe her indemnification or a defense. And while Dinger may have wasted time and money pursuing relief under the FTCA, she cites no authority indicating that an incorrect representation on a point of law—here, interpretation of the Policy's coverage provisions—creates liability upon which Dinger could recover. Accordingly, Dinger has not identified any material fact, disputed or undisputed, that could support her estoppel or waiver arguments.

As Dinger has failed to make a sufficient showing on an essential element of her case as to which she has the burden of proof—that St. Paul breached a contractual obligation under the

Policy—St. Paul is entitled to judgment as a matter of law on Count One and Count Two of Dinger's Amended Counterclaims.

### IV. St. Paul's Request for Declaratory Judgment

Finally, the federal Declaratory Judgment Act allows federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Federal courts hearing cases pursuant to diversity jurisdiction apply state substantive law and federal procedural law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Declaratory Judgment Act provides procedural law, and thus governs this Court's consideration of St. Paul's claim for a declaratory judgment. *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937) ("[T]he operation of the Declaratory Judgment Act is procedural only.") "Declaratory judgment actions are particularly appropriate for situations in which insurance companies seek a declaration of their liability." *Bd. of Cty. Comm'rs v. Cont'l W. Ins. Co.*, 184 F. Supp. 2d 1117, 1122 (D. Kan. 2001). Here St. Paul has shown on the undisputed material facts that Wishkeno was not covered under the Policy. This Court therefore issues a declaratory judgment that St. Paul has no duty to pay any part of the judgment at issue in this matter, because St. Paul has no duty to defend or indemnify Wishkeno or Dinger under the Policy.

## CONCLUSION

For the foregoing reasons, the Court grants St. Paul's motion for summary judgment (Dkt. No. 57) and denies Dinger's motion for summary judgment (Dkt. No. 73). The Court further finds that St. Paul is entitled to a declaratory judgment to the effect that St. Paul has no duty to pay any part of the judgment entered in favor of Tammy Dinger against Candace Wishkeno by the District Court of Riley County, Kansas.

ENTERED:

Dated: November 30, 2020

_____
Andrea R. Wood
United States District Judge